U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 APR 18  PM 12: 54**

CLERK

BY _____
DEPUTY CLERK

Attorney for Plaintiffs:
Holiday Inn, Silverleaf, Orange Lake Timeshare Owners
**The Abrams Firm**
**John P. Abrams, WA Bar No.: 31068**
1401 Marvin Road, Ste 307
Olympia-Lacey, WA 98516
Telephone No.: 360-918-8196; Facsimile No.: 855-820-2142
**Josh Martin Vt. Bar No.: 4713**
38 N. Main St. #189
St. Albans, VT 05478
(802) 233-2545
litigation@theabramsfirm.com; greenmountainlegal@gmail.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF VERMONT

|  |  |
|---|---|
| Athena and Jantha **Williams**, Brian and Judy Glass, Erin and Christy McComack, Richard Rosario, Toby Lee Rutter, Romeal and Angela Stephens, Evette Tribes, Calvin and Sherae Walton, Vincent Yi, Zane and Kalonna Zeigler, Cecilia Iliesiu, Douglas and Kathy Leger, Ronald Lewis, and Joseph and Lisa Manno, | Case No.  2:19-cv-57 |

Case No.  2:19-cv-57

COMPLAINT FOR DAMAGES FOR
FEDERAL SECURITIES CLAIMS;
COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTACT;
ELDER ABUSE; VERMONT CONSUMER
PROTECTION ACT

**Plaintiffs,**

**v.**

**HOLIDAY INN**

HOLIDAY INN CLUB VACATIONS,
SILVERLEAF RESORTS, INC., ORANGE
LAKE RESORTS, AND ORANGE LAKE
COUNTRY CLUB, INC., AND DOES 1-5
AND ROE CORPORATIONS, 1-10,

**Defendants.**

**Demand for Jury Trial, F.R.C.P 38**

Date:
Time:
Courtroom:
Judge:

1

2

COMES NOW, the Plaintiffs, by and through their counsel of record, Josh Martin of THE ABRAMS FIRM, to complain of Defendants as follows:

3

4

5

6

7

8

This is a complaint for federal claims, claims made for violation of the United States Securities Act and Pendant state law claims, including fees pursuant the Vermont Consumer Protection Act, arising out of the sale of timeshare units to Plaintiffs by Defendants Holiday Inn, Silverleaf and Orange Lake (which includes Orange Lake as the parent company of the other entities, collectively hereinafter referred to by its Flagship name: "Holiday Inn" or "Defendant").

9

10

11

12

Defendant is the owner and manager of numerous timeshare resorts in the United States, including at least one resort in the District of Vermont and having a national sales network with significant contacts in many states. Plaintiffs purchased the units sold to them by employees or agents of Defendant Holiday Inn.

13

14

15

16

17

18

During the course of the sales pitch, the salespeople as agents of defendants made various statements relating to the value, use and prospective increase in value of the units purchased. The salespeople also made various promises of goods and services for value and enticed Plaintiffs to purchase units with promises that they were getting a "special" or "severely discounted" purchase price or that Defendant would provide them "credit" to purchase a new unit at a reduced cost.

19

20

21

Subsequent to the purchase of the timeshare, Plaintiffs discovered that using the units was virtually impossible or that they had to make plans a year in advance or that the promised transferability to other resorts was not "free" but cost substantially more than represented.

22

23

24

Additionally, Plaintiffs realized that the "maintenance fees" both increased substantially each year of ownership and never ended, which was different than what was represented to many of the Plaintiffs.

25

26

27

28

- 2 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1

2

3

     Plaintiffs were guided through the closing of the sales transactions by Pseudo attorneys and or Attorneys employed by defendant, who either misrepresented the law or misinterpreted the law and or overlooked critical terms and conditions of the sale to Plaintiffs' disadvantage.

4

5

6

7

8

9

10

     Plaintiffs contend that Defendant's timeshare sales representations were in fact a fraud in the "Offer of" or "Purchase of" Securities and violated the United States Securities Act, federal common law and state law. To the extent that Defendants' agents rendered legal or reasonably understood Plaintiff's to understand that they were doing so, Defendants engaged in the Unlicensed Practice of Law (UPL). Additionally, Plaintiffs allege that the calculation of damages are subject special damages and attorney fees pursuant to the Vermont Consumer Fraud Act.

11

### A.

12

### **JURISDICTION AND VENUE**

13

14

15

16

17

18

     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a) because this complaint seeks damages for each Plaintiff well in excess of $75,000 exclusive of interest and attorneys' fees, all are in the hundreds of thousands with Punitive Damages calculated, which arise under several of the causes of action herein (see Section VIII). Additionally, there is diversity among the parties meeting the requirements of §1332(a).

19

20

21

22

23

24

25

26

     This Court also has jurisdiction pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77t(b), 77t(d)(l) & 77v(a) and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78(u)(d)(l),78u(d)(3)(A), 78u(e) & 78aa (and their Federal Law cited herein). Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

27

28

The Court has jurisdiction over pendant state law claims pursuant to 28 U.S.C. §1367, the Supplemental Jurisdiction statute, because the state claims are so related to the federal claims and arise out of the same case and controversy.

Venue is proper in the District of Vermont pursuant to 28 U.S.C. §1391 (b)(1) because Defendant resides in the District and under 28 U.S.C. §1391(c)(2, because Defendant is subject to personal jurisdiction in the District.

Venue is also proper in this District pursuant to Vermont Law, and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.§ 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, and Defendant resides in this district.

## B.

## PARTIES

Plaintiffs, Athena and Jantha Williams, are residents of the State of New York.

Plaintiffs, Bryan and Judy Glass, are residents of the State of Georgia.

Plaintiffs, Erin and Christy McComack, are residents of the State of Texas.

Plaintiff, Richard Rosario, is a resident of the State of Texas.

Plaintiff, Toby Lee Rutter, is a resident of the State of Texas.

Plaintiff, Romeal and Angela Stephens, are residents of the State of Illinois.

Plaintiff, Cecilia Iliesiu, is a resident of the State of Washington.

Plaintiff, Evette Tribes, is a resident of the State of Texas.

Plaintiffs, Calvin and Sherae Walton, are residents of the State of Michigan.

Plaintiff, Vincent Yi, is a resident of the State or Georgia.

Plaintiffs, Zane and Kalonna Ziegler, are residents of the State of Texas.

- 4 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs, Douglas and Kathy Leger, are residents of the State of Texas.

Plaintiff, Ronald Lewis, is a resident of the State of Texas.

Plaintiffs, Joseph and Lisa Manno, are residents of the State of Missouri.

The above listed Plaintiffs sue in their individual capacity and in their capacity as spouses to the extent that any principles of Community Property law or other laws regulating marital property may apply to their joint assets or debts.

Plaintiffs are joining together in a "Plaintiff's Group", where consolidation is judicially efficient because of the same Defendant and same claims (many share all [or all but one], causes of action) and very similar and like factual patterns due to Defendant's conduct that occurs in multiple sales facilities, yet all have substantially similar claims, where certain patterns of 'fraud schemes' are all pled with particularity herein, including UDAAP equivalent abusive sales practices and predatory lending practices.

Defendants, collectively herein known as *Holiday Inn* (*the Orange Lake Country Club, Inc. parent corporation et. al, including its subsidiary Silverleaf Resort, Inc. and dba names selling the parent company's timeshare products, specifically including its flagship name: "Holiday Inn"*) are all under State Corporations incorporated in Florida State, with principle places of business located in Florida, but registered and conducting business within the District of Vermont. Defendant is in the business of developing and selling vacation timeshare real estate "units" and/or membership "points" [terms of art] in various locations across the United States, including a large network of resort accommodations and component sites that are all located within the State of Vermont.

DOES I through V, and ROE CORPORATIONS I through V are persons or entities, currently unidentified, which in some way participated in the violations of law committed by

- 5 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Defendant. Plaintiffs will seek leave to amend this Complaint when the true names and identities of the DOE and ROE CORPORATION Defendants have been discovered.

## C.

## **SUBSTANTIVE ALLEGATIONS**

At the Timeshare sales presentations (the point-of-sale), the Defendant's Sales Representatives made all of the following untrue, deceptive & misleading statements and representations:

1.     That the timeshare was "valuable" and would be always be a "good investment" as a long-term "asset" that could be resold for a "profit" due to appreciation. However, the Plaintiffs herein later discover that there is no promised market value, thus resales are not possible, and some have testified to seeing thousands of timeshares on eBay (and or Craigslist) for only $1.00, and they are still not selling, for even $1.00.

2.     That Consumers (Plaintiffs herein) were told by the sales persons that they must buy that day and if they did not purchase at that time, the price would be many thousands of dollars more (a deprived benefit of a monetary penalty for not buying that day).

3.     That the Timeshare was "easy to sell" because it was so "valuable and desirable" and that Defendant would help them resell or take the timeshare back if the Plaintiffs no longer wanted it, which the Consumers learn years later is untrue, when they call to try to invoke their promised rights.

4.     That the timeshare maintenance fees either (1) do not go up at all (fixed), or (2) would go up very little. However, regular escalation of yearly maintenance fees is commonplace.

5.     That Plaintiffs were not told about successor liability when they die, and all that Plaintiffs were told, was that this timeshare was a valuable "asset" or a "legacy", and that at the Owners' option "could" be put in their Will and that the Owners (Plaintiffs) "can"

- 6 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

decide who gets it in their Will. As a result, none of the Plaintiffs knew the truth that, despite any *possible future act* (making a Will or a Codicil if a Will exists), the Timeshare Contract being fully executed that day, would already eternally bind all of their children (as "successors") to be jointly & severally liable for the ever-increasing debt, continuing to their children's children for generations to come.

6.    That because Plaintiffs would own prime resort "property", they could make "rental income" that would be more than was paid every year in maintenance fees. Some Plaintiffs were told it would pay the Maintenance Fees and the Mortgage, and still have a residual balance left over for "profit".

7.    This indicated that Plaintiffs could "make money" (as Representatives stated) by renting their timeshare. However, Plaintiffs discovered much later that they cannot reserve a vacation and book a room for themselves even. They are also not told that the reservation costs will be hundreds of dollars more (non-refundable) to book for persons who are not owners [resort reps had falsified rental income to offset costs].

8.    That the sales representatives stated that once you become a timeshare "owner" then anytime, anywhere booking would be "easy" which is ardently refuted by Plaintiffs, where bookings are restricted to 11 months out and none of the destination locations, nor the 5 star resorts (often specific Resorts), that were promised at the point-of-sale, were available in actual and repeated attempts to get what the Consumers (Plaintiffs herein) paid tens of thousands for, and unwittingly obligated themselves and their family for hundreds of thousands of dollars into the future.

9.    That the details of the purchase were not fully disclosed to the Plaintiffs and that they were not provided an opportunity to consult independent legal counsel or outright prevented from seeking outside legal counsel or provided Holiday Inn or other Defendant "legal counsel" who explained some sales terms and conditions, but overlooked

- 7 -

…

others, and who did not seek authorization or inform Plaintiffs that the Attorney of the Defendant's provision of "assistance" was a potential or actual conflict of interest in their providing legal counsel in explaining and closing the timeshare sales contract.

10.     At best, "owners" received only heavily advanced bookings (11 months) for what was often meager "Motel-like" accommodations in unwanted locations that they were *told* were the only rooms available, yet the "public" can readily book (consumers view on Expedia.com and elsewhere on the Internet) immediate reservations anytime, including the next day, and that is the same accommodations and amenities that the "owners" (Plaintiffs herein) had originally desired, and were promised at the point-of-sale if they only became "owners", but in practice had extreme difficulty booking once they became "owners".

11.     That some Plaintiffs were told they would receive better amenities as "owners", and some of the Plaintiffs took tours of the type and quality of room accommodations that they would "always" stay in, but in real application, these benefits of ownership were exposed as more layers of Bait & Switch Fraudulent Inducements for the sole purpose to advance a sale of a unit.

12.     That for some of the Plaintiffs, they were involved in Secondary fraud & deceit to sell "Upgrades" (thousands of dollars) for the sole purpose of resolving prior deficiencies which in fact were created [to cause the need for a future Upgrade] by the same Defendant at a prior sale. And for some this Upgrade process repeated itself several times; however, the new Upgrade(s) never resolve the prior problem or deficiencies they are purported to fix.

13.     That "Upgrades" purchased by Plaintiffs often more than double the victim's fees, and always increase the fee, with often many thousands paid in a down payment and large Mortgage balances sometimes in the tens of thousands.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

14.     That many Plaintiffs report they had <u>difficulty or no Cell Phone service</u> during the period in which the Sales Presentation occurred, and that the alleged lack of service is due to Defendant's utilization of a <u>phone blocking or interfering device in violation of FCC Code</u>, the Federal Communications Act and other federal law are exposed as fraudulent tactics.

All of the above allegations show lack of truthfulness, if not blatant fraud & deceit perpetrated by the Defendant, its' sales persons, its' management and attorneys, all with the intention of inducing consumers to make a purchase that day. Plaintiffs believed these statements, and they relied upon them to their unfortunate detriment as victims of Fraud.

## D.
## PLAINTIFF FACTS

### ALLEGATIONS PARTICULAR TO EACH PLAINTIFF

All Plaintiffs have a strong correlation of similar fraud schemes, along with these 4 commonalities:

1. Plaintiffs did not receive proper Public Offering notice.

2. Plaintiffs did not receive proper Statutory Rescission notice.

3. Plaintiffs did not receive any notice at all of Successor Liability.

4. Plaintiffs, because of the principal, interest & fees, pay weekly rates in the high 1000s -to- 45,000 per week (p.59) and not 5-star promises ("Motel-like" rooms).

These are independent grounds for Rescission in addition to those based upon common law Fraud or statutory relief which are derived from the Plaintiffs' individual facts

- 9 -

that are all pled with particularity. There are varying degrees of noncompliance of 1-4 above, however, 1, 2, 3 and 4 (above) apply to all Plaintiffs herein.

### *Brian and Judy Glass*

Brian Glass is a military veteran and received a Medal of Commendation. In 2016 the Glasses (hereinafter "Plaintiff's") purchased what they were told was a "piece of real property" which was a "unit" that was called "real estate" and was guaranteed for one week out of the year for a 3 Bedroom, 2 Bath accommodation anywhere, anytime at all Holiday Inn Resorts and through trades at 5-Star resorts worldwide through Defendant. ["units" and "points" are terms of art, where claims of valuable real estate "units" are used to deceive purchasers who receive the underlying "points" used for booking, which never (herein) are able to achieve the specified use rights promised at the point of sale].

*Sales Presentation – by a "Church Deacon"*

Plaintiffs were subjected to a 5-hour presentation before making the purchase. Their sales representative, Leo Alvarado, claimed he was a "Church Deacon" in order to gain Plaintiffs trust. His wife even called during the sales meeting to say, as told by Alverado: "she was praying that you getting the timeshare would be God-blessed with a positive outcome for your lives."

Alverado presented the Plaintiffs a unit with an initial cost of $28,000.00, which the Plaintiffs rejected. Thereafter, a manager came in the room and offered the Plaintiffs a new price of $16,000.00 for the same number of "points" (96,000) as the former higher priced unit, but they could only receive such a price reduction if they purchased the unit "today" as instructed by management.

*Contract Signing*

During the contract signing a "Quality Assurance" Holiday Inn staff person summarized the legal terms of the contract with the Plaintiffs. This took around 10-15

- 10 -

minutes. Holiday Inn representatives told them what they would do on vacations every year (Reps said "only pay the mortgage").

They were told that once they paid the timeshare mortgage off, that they could take vacations for the rest of their lives, "for free". However, the Plaintiffs were not made aware of annual maintenance fees of $700 per year and a $200 booking fee. In reality, there would be no "free vacations"- ever. The Plaintiffs essentially paid $16,000.00 for the right to take a $1,000 paid vacation every year.

*Points Use – Extra Fees & Restrictions*

The sales representative told the Plaintiffs the 96,000 "points" they purchased would get them vacations "anywhere, anytime," and into "any 2- or 3-bedroom size room they needed".

Plaintiffs were not aware how little the number of "points" they had were worth until they tried to book a vacation. In 2017, Plaintiffs booked a vacation in Orlando, Florida, but had to *borrow* against the next year's points in order to have enough points for the trip.

Plaintiffs had to pay a $200 fee for the week, $200 to book the room and a $700 maintenance fee ($1100). And after high-interest and fees, about a $40,000 cost in 10 years.

Plaintiffs were not told they would have to pay for any amenities, booking, or maintenance fees during the presentation or the Contract's signing the First year.

The Plaintiffs were also told they would receive "double" the points purchased for signing up. When they called several weeks later to use the points, they were told they had to make six (6) full payments prior to receipt of the bonus points, which was not disclosed to them during the 5-Hour presentation at the point-of-sale.

It was also not disclosed to the Plaintiffs, that there was also a "waiting period" before any unit bookings could be made.

*The Room Assigned*

- 11 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

The room Plaintiffs received on vacation was nothing like what they were shown in sales brochures presented at the initial sales presentation where representations and pictures showed modern architecture and decorating.

However, the room assigned was described as "it smelled like a wet dog and was decorated like it was from the 1960's." About an hour after Plaintiffs arrived for their stay they were bombarded by calls they attend a "New Owners" meeting, which was just another sales pitch for selling additional vacation points (an "Upgrade"). The water park was a selling point for the Plaintiffs, because they had young children, but it was completely overrun with people.  They could not get floats for the kids and the water was brown and dirty.

*Not Real Property*

Plaintiffs were told they were buying "real" property in Florida and they would "own" this piece of property, which was "deeded" to them. However, the "points" the Plaintiff actually received are inadequate to book the promised use rights.

*POS and Rescission – Improper Disclosures*

Plaintiffs were not told about, nor given a Public Offering Statement(POS)with adequate time [or any time whatsoever] to review prior to their sales-oriented discussions and/or the actual purchase and contracting for the timeshare.

Early on we were not happy and we tried to get out of it and went back and forth a couple times over the phone and on email, then they said we could not get out by then.

Plaintiffs were also told the timeshare "could go to your family, or whoever you leave it to". The Holiday Inn staff told them they **"could"** pass this "valuable property" on to their children in a Will. As stated by the Plaintiff on this issue, Plaintiff recalls:

*Most likely there would have been no contract signing if we had known because definitely this was a big disconnect of what they told me and what happened.*

- 12 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

*Successor Liability*

Unknown to these Plaintiffs, the timeshare Contract would automatically bind future generations of their family to the ever-rising maintenance fees under the "successors" clause, where Holiday Inn could go after one or two of their Daughters. when Brian and Judy Glass pass away.

## *Erin and Christy McComack*

In January 2015, daughter Erin McComack and mother Christy McComack (Murphree), hereinafter "Plaintiffs", believed they bought a "deed" to property at a Silverleaf resort.

A very short time later, Erin and Christine attended what they were told was an "Orientation Meeting" in order to learn how to use their timeshare they had just purchased.

The Plaintiffs did not even know that they had bought "Points" and also found out from the reps that the timeshare they purchased just about a month ago, they were being told is a deficient amount of points [useless] for travel.

The meeting turned out to be a 4-Hour high-pressure sales presentation where, though they entered in hopes they could get out of their barely one-month-old original contract, instead they left with an "Upgrade"

The word "Upgrade" is term of art for secondary sales after breaches of preexisting duties promised in a prior sale(s), where the resort again misrepresents benefits to perpetuate the *cycle: need & promised fulfillment*. Upgrades are typically Novation Contracts. Many Plaintiffs had 2-3 upgrades for tens of thousands more in loans & fees, where Defendant claims they are somehow needed to fulfill prior promised benefits.

*Real Estate v. Points*

Plaintiffs were at first told they had purchased "real estate", but instead found out they purchased "points" and only realized that it was a point system <u>after</u> they had already

- 13 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

signed off on to the initial timeshare contract. Plaintiffs were invited to an "Orientation Meeting," where they learned for the first time the timeshare uses points. They only agreed to the Upgrade in order to obtain unit usability, which now required more points.

Plaintiffs asked at the upgrade meeting if the resort would take the previous "points" back (since they didn't work as promised) and they were told "No." The Sales Representative then said they were just trying to make it right and just so happened to have whatever it was they were concerned about. By the time of the signing (4-Hours later), the Plaintiffs were exhausted and starving and just wanted to leave.

*Contract Signing*

During the rapid contract signing process at the end, the representatives controlled everything and merely summarized the terms of their contract instead of Plaintiffs being given an opportunity to review the terms themselves. By the time Plaintiffs signed the documents, they were stressed and hungry. The representatives would merely point to parts of the contract and say, 'this means this,' briefly summarizing the terms using their own words.

Plaintiffs were told by one of the representatives that the maintenance fees for a timeshare she owned had never gone up during the time she had her unit. This gave Plaintiffs the impression that their maintenance fees would similarly see no increase. However, Maintenance fees have gone up far more than Plaintiffs expected.

*Trades - Exchanges*

Plaintiffs were particularly interested in using their points at resorts worldwide, which they were told by resort reps was included in the purchase of their unit. Access to the 5-star resorts available through trades was a fundamental selling point for Plaintiffs. They later learned that using the trading is practically infeasible due to the points and fees required to book a room.

- 14 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1

2

A sales representative asked them "where they wanted to go" and pointed out Hawaii and Paris as possible locations. Plaintiffs wanted more trading benefits for different locations. Plaintiffs were repeatedly told, and thus believed that they were purchasing more points and thereby more trades and usability as elaborately described by the reps.

Plaintiffs never realized that trading would be so difficult. Availability is a big problem because it is basically impossible to find a date so far in advance of their vacation (11 months). Plaintiffs thought the trades were part of the deal and didn't realize there would be extra fees and costs associated with using trades. In reality, Plaintiffs did not even have anywhere close to enough points to go to Hawaii or Paris with the points they were sold.

*Rescission Rights Blocked*

The Plaintiffs may have been deceived trying to get of the Upgrade (a novation Contract which makes it the *only* Contract), because Defendant Reps said they could only get out within 7 days of the Contract (meaning the original Contract); however, the Upgrade/Novation/Only Contract was able to be cancelled despite the fact it was "beyond 7 days after the contract" [i.e. the original contract date about a month prior].

*No POS Review*

The Plaintiff was not given a Public Offering Statement (POS) to review prior to the purchase, with adequate or any time to review prior to their sales-oriented discussions or the actual purchase and contracting for the purchase of a timeshare. She recalls that after the presentation and signing: *I got a huge stack of papers but I do not recall being given any time to read it.*

*Successor Clause*

The successor clause of Erin and Christine's contract was misrepresented to them at the point-of-sale. Timeshare's disposition upon demise, to here Reps said Plaintiffs as owners "**can** pass our investment on to our heirs."

- 15 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Plaintiff recalls:

*They said it was valuable and something our kids would want. We pay $400 a month since the upgrade and about $90 in maintenance fees every month. The sales representatives never said if we die we would be forced to pass it on, and I would not have purchased if I had known I couldn't sell it and would be forced to pass it on.*

### *Richard Rosario*

In 2017, Richard Rosario was 24 years old and persuaded to buy purchased a timeshare from the Defendant, Holiday Inn Club.

Plaintiff signed up because he believed in Holiday Inn's promises that he would: (1)save money on vacations, (2) make money on the unit, (3) have more freedom for vacation destinations, and (4) have an easier time traveling by purchasing the unit, than without it.

These representations over time were each eventually discovered to be false.

*Sales Presentation – Profit - Resale*

The representative said the presentation would last "1 hour" but it lasted four hours (4-Hours). The Plaintiff travels out of town a lot because of employment. The Plaintiff took the Defendant representatives' statements at face value when they directly said that he would be saving money instead of spending money, and that he could profit substantially from renting the timeshare out to other people.

The Holiday Inn reps ("Samis", his Manager and the Quality Assurance closer) all coordinated upon the sale. Plaintiff started with "Samis" who claimed to own his own unit and can travel a lot more and help out his family and can vacation better than his friend who is a doctor, but Samis could go to better places that the doctor can't get into.

Defendant's salesman and manager both said that the timeshare was "desirable" and when Richard decided that he was done with it someday, "everyone would want to buy it" and he could just "sell it like a home" as reps repeated stated to the Plaintiff.

- 16 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1     A Quality Assurance person toned down the pressure tactics and was described by

2  Plaintiff as "laid back". However, she only spent 15 minutes and controlled the signing of a

3  huge amount of paperwork that was very different than promises made. Noting, all 3 reps

4  said it would be easy & profitable to sell.

5     *Value – Returned Inventory*

6     The sales representative described how Plaintiff would be getting the timeshare at

7  "below market value" because "someone else just upgraded and had been paying on it."

8  Thus, equity was recouped by the purchase of the paid-down unit.

9     However, the "unit" is just "points" and there is nothing that exists to be "paid-

10  down" because it is just points.

11     *Promised Valuation v. Actual Use Rights*

12     The promised Use to the Plaintiff was for amazing resorts. Plaintiff recalls:

13  *They had resorts and hotels I could stay at in Asia, Europe, the Caribbean Islands and*

14  *beaches in South Carolina, so that families and regular people can leave what the Holiday*

15  *Inn people called, "a legacy" for their children.*

16  *I travel all the time for business. They said I could save money on hotel instead of spending*

17  *it. But the points couldn't cover it when I tried I only got 1 weekend for all my points and*

18  *that's not what I signed up for.*

19  *I'm having to travel less now than I was before and that was the whole point of getting it;*

20  *more travel, more flexibility, saving money, none of this turned out to be true.*

21     The Plaintiff's *promised Use Rights* were for frequent hotel bookings and occasional

22  resort weekends, and both with better flexibility than online or 3rd parties could provide.

23  However, the *actual Use Rights* are not as promised. Plaintiff obligated himself to about

24  $50,000 in just over 10 years (with very high interest and rising fees) for 5-Star luxury

25  resorts anywhere & anytime, but not $50,000 for 1 weekend a year where decent places are

26

27                                                                              - 17 -

28  COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
   RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

all "fully booked" inventory and for anything, dates are highly restrictive (including 11 months in advance), making travel impracticable.

*IRS Tax Law Advisement*

The contract closer for Holiday Inn said she was an insurance person who knew the law and proceeded to advise on Carolina Tax Law and IRS Tax Law. It was convoluted, but because South Carolina has lower tax rates, the Plaintiff could use whatever he paid off on the timeshare as an "IRS Tax deduction"

*No POS*

The Plaintiff was not given a Public Offering Statement (POS) to review prior to the purchase, with adequate or any time to review prior to their sales-oriented discussions or the actual purchase and contracting for the purchase of a timeshare.

*Successor Liability*

Plaintiff was told the offer was "only good for that day." The representative put pressure on Plaintiff by claiming that "he would never get anything close to this price again if he did not buy today."

The representative went on to say, "you **can** pass this along as an inheritance to family once it is paid off."

They never disclosed to Plaintiff that it would become forced debt (Mortgage and Maintenance Fees) upon his "successors" (adult children and their children…), happening automatically upon his demise, which could happen the next day.

If they had told him, he has fervently stated that he would not have agreed to the purchase.

When it came to actually using the timeshare, Plaintiff only had enough points to cover a single weekend stay. Additionally, none of the representatives ever explained to him that there were only certain places he could stay when using points.

- 18 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1   Plaintiff is traveling less now than he was for work at the time of the purchase when

2   easy travel was the whole point of purchasing the unit. Plaintiff is not getting the benefit of

3   his bargain.  If the representative had explained what he would later learn on his own, he

4   would not have agreed to enter the timeshare contract.

5   ### *Toby Lee Rutter*

6   Toby Lee Rutter purchased his unit from in August 2016.  Toby Rutter was forced to

7   sit through an aggressive and misleading high-pressure eleven and a half (11½) hour sales

8   presentation and very rapid contract signing.

9   Ultimately, the Plaintiff relented to the purchase because he believed the expert

10  representations made to him by his sales representative regarding the quality of the

11  accommodations, the ability to trade and use the interest, its marketability and expected

12  appreciation, and also because the Plaintiff was truly afraid of upsetting the salesperson.

27  - 19 -

28  COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
    RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

*The Sales Presentation*

At the time of the purchase plaintiff was on vacation, when he arrived at the Resort he was told that Holiday Inn had just bought Silverleaf, so there are some new rules that they wanted to go over with him, where Holiday Inn would give him $50.00 for ninety (90) minutes.

Plaintiff's girlfriend was with him and he did not want to go to the sales presentation, but he promised he would go and learn about the "new ownership" in the morning, then spend the rest of the day with her.

Plaintiff's appointment was for 10:00 a.m. The Resort Rep asked him what he didn't like about his timeshare? He said one of the biggest things is that whenever he calls to book the unit, he is told that they didn't have anything available, and it's frustrating, because he could hardly get any time at the timeshare.

The representative said, "the week system at Silverleaf is faulty. The points system at Holiday Inn is better."

The reps showed the Plaintiff a book of resorts in Florida and shared with him how the points system works. They shared with him that, "20,000 points today is still going to be 20,000 points in fifty (50) years because inflation not going to affect the points system."

*The Sales Person – Fear of Violent Outbursts*

Plaintiffs sales representative was very domineering during the sales meeting. He told Plaintiff he was an Iraq War veteran. Plaintiff noticed he might have been going through a flashback or something like PTSD during the sales meeting because he looked very intense. He then told Plaintiff in the meeting that he has emotional "triggers". Plaintiff saw in the sales persons eyes what he believed to be a trigger coming on, so rather than engage him he just calmed him down and said, "it's ok, I'm sure these numbers are ok."

- 20 -

The Sales Representative kept pressuring him and asked him if he believed these numbers. Plaintiff said, "I don't, but I don't need to." Plaintiff eventually said, "Yeah I believe it" just to keep sales person from triggering. He was described as, very aggressive and scaring the Plaintiff.

Plaintiff was frustrated because cell-phone reception was bad at the location of the sales meeting, which has happened lots of Defendant's sales rooms. It was hard to communicate with his girlfriend to consult with her about the purchase. There were numerous paperwork delays.

Plaintiff was exhausted and tired, not provided lunch, nor dinner; and he was intimidated by a mentally volatile combat vet, thus, he finally gave in. By the time the deal was signed the ordeal lasted from 10:00 a.m. until 9:30 p.m. at night (11½ hours).

*Bait & Switch*

The timeshare owned was not the one Plaintiff was sold.

One of the misrepresentations that Holiday Inn sales representatives told him was that the timeshare he was purchasing was directly comparable to the resort, and room accommodations and style, even the "immaculate view" at the resort where the presentation was taking place.

Well after the Plaintiff purchased the unit, he decided to look at the room and view, so he went to the resort where his timeshare was located and learned for the first time that he was sold a hotel room rather than a luxury resort unit.

Plaintiff recalls:

*The resort where the presentation was taking place was beautiful, the view was immaculate. The architecture was amazing. The representative looked into the system and found a unit in Missouri. I asked, why not a unit here? And he said he can't sell it yet, because it's not finished.*

- 21 -

*Then he found a unit down the road.  He was able to get the Penthouse that was comparable to the unit they were in.  The sales rep said, "You're getting the Penthouse, the best unit in the resort, with the highest points available, 229,000, at a very good price."*

The sales representative said that *it's a resort right on the ocean*. But Plaintiff states that the property felt more like a hotel and not a resort. It's on a U shape, and his unit is at the back of the U.  The swimming pool takes up the whole courtyard area. Beyond that is a gate. When you go through the gate, it goes to the ocean, but they lock the gate at 10pm, so you have no access to the beach after 10:00 p.m. They said Plaintiff could have access the beach all the time—but he could not have that, nor the room appointments or the luxury resort, nor the "immaculate view" or the "Penthouse" or anything else to do with the promises at the point-of-sale.

*The Location was Misrepresented*

When Plaintiff did have a chance to go down to the resort. It was not where they told him it was. Plaintiff went onto the property and talked to the receptionist. She told him that the unit he bought is empty right now, so he went in.  He took pictures of the unit, and the unit is not close to being comparable to what they showed the Plaintiff at the time of purchase.

*Easy Booking, Use and Marketability*

The Representatives misrepresentations about the quality of the timeshare was coupled with further misrepresentations about how easy it was to use and trade the interest. Plaintiff discovered quite the opposite and as a result has <u>never</u> actually been able to use the unit.

The Representative said to the Plaintiff, "You can book anywhere around the world and exchange with all kinds of hotels and resorts around the world."  Holiday Inn reps asked Mr. Rutter about his favorite world destinations. Whatever Plaintiff said, they said "we have

- 22 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

resorts there." They told him about Florida and said he can go to their main Orange Lake resort. They said that on a points system there won't be problems booking because he won't be competing with other people. These were all deceptions.

*The Point System and Valuation*

The Point system is best they said because, "You can book at any resort, take any cruise and can travel to even more exotic places."

About five weeks after Plaintiff purchased the unit, he had friends visit. He asked if he and the friends could stay at the property, and they said, "We're in the middle of transition, we can't let you do that." This was beyond the timeframe of when they told Plaintiff he was supposed to have access to the unit. It was very embarrassing for Plaintiff.

Plaintiff has not been able to book time anywhere. He inquired about the Hotel in Iceland, and they said they actually didn't have anything there at all that he could exchange with.

Plaintiff was also told that he was purchasing a valuable asset that would undoubtedly appreciate in value, the reality of which is there is no market value as was promised by the Holiday Inn reps.

*Rental Income*

Plaintiff recalls,

*They said it's easy and profitable to rent with the points system.*

*You just give your points up and Orange Lake arranges it or I can just give others the points.*

*They said it will be so easy to do with the points.*

*The reps said that some people rent it out and it pays for a whole year of their mortgage payments.*

*IRS Tax Law Advisement*

- 23 -

The reps said that the timeshare lets you write off all the interest to the Mortgage on your taxes. The reps said it is an allowable deduction under IRS Tax Law.

*No POS Review*

The Plaintiff was not given a Public Offering Statement (POS) to review prior to the purchase at all. The Plaintiff did not have the POS before contracting for the purchase of a timeshare.

*Successor Liability*

The reps stated that you "**can** give it to your kids or grandkids by putting it in your will." The reps also said "it would be perfect for them, it doesn't increase with inflation." Therefore, the Plaintiff was led to believe various deceptions. Plaintiff recalls,

*They said the "unit" was "a valuable asset" I could leave to anyone I chose.*

*And the "points" I could let the kids and grandkids use, because the reps said that they can all use it at the same time at locations all around the world with under The Holiday Inn points system.*

*Everything sounded like an option, nothing forced and everything was flexible and included in the points system if I just became part of it.*

### *Romeal and Angela Stephens*

Romeal Stephens made his initial timeshare purchase in 2011 from Silverleaf. Romeal and Angela, have upgraded their unit four (4) times.

Their ordeal began in 2011 with a Timeshare deeded at Piney Shores, and specifically not the promised deed at "**Fox River**" resort [as they so desperately desired].

Within a month of this initial purchase they went back only to be told that the old Representative "screwed up" but the new Rep would gladly upgrade them, then the Stephens discover that it was still not a deed at Fox River.

*The Upgrades*

- 24 -

A year later, while attempting to get a hold of the Fox River deed, the representative had a better idea and sold them a second timeshare with assurances of trading at Fox River, only for the Stephens to have more and more problems trying to actually use this Fox River priority booking method.

*Triple the Amount Paid*

Finally, Silverleaf cleverly reached out to the Stephens to lure them into, yet another, 4th Upgrade with Fox River being the end result.  Desiring to have a resort close to home to fit their lifestyle as Fox River did perfectly, the Stephen's were duped into an elaborate scheme where they nearly tripled the amount originally paid.

Plaintiff recalls:

*Andy was our sales guy, he gained our trust along with Zack the finance officer.  They carried themselves as professionals, they were charismatic and downplayed the last Representative that we purchased from... they would say... it is such a shame what the last Representative did.*

*The Sales Presentation*

The last presentation was an eight (8) hour ordeal resulting in Silverleaf having to book a room for these tired Consumers.  When it was time to sign the Contract, it happened in a flash.

Plaintiff recalls:

*The last time we were there at least 8 hours, we were there until 11 pm at night. It would start with one person, then another person, then another person and then sometimes the first person would come in and sit in on it. They would change people, all with different angles and all coming at us very hard.*

*Contract Signing*

- 25 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

The contract signing was extremely fast, as Reps would say "this paper you already know about" or "we spoke about this already, so you can just sign."

Multiple representatives were tag teaming the Plaintiffs to handle any possible questions raised, and now their deal-saving replies have been discovered as false. Volumes of paperwork came after many hours of sales-oriented activity, and most particularly the last several hours of grueling high-pressure sales (constituting many hours of wearing the consumers down). The Closer picked up the pace dramatically to hurriedly sign them fast, and not to read the documents, nor point to its key clauses, but rather act as their *de facto Legal Advisor* who explained with interpretive generalizations what the legal clauses content supposedly said and thereupon advised they sign.

*Purchasing a Foreclosure is a "Deal"*

The ongoing pitch for years was to offer a foreclosed property that was worth *far more* money at a special selling price for these particular consumers.  Plaintiffs took the Bait as specific amounts were thrown out, making this seemingly valuable property worth the long-term "investment" profit.

Plaintiffs were always told they were getting the property for far less than the market value.

Plaintiff recalls: *In the last upgrade they told us it was worth $80,000 then another person would come in and look at our paperwork and say, "You are getting this, wow I can't believe they are offering this to you." They kept telling us how much it was worth. They said the property at Fox River was $80,000.*

*Valuation and Marketability*

These consumers (the Plaintiffs) were told that they could make a profit on the purchase, and as the Plaintiffs recall: *they would say we can't tell you how much, but we know you can get $87,000 or at Fox River a "Presidential" could run you $90,000. What*

- 26 -

*made us seek out this Fox River deal was that originally, they said it would be $100,000 plus, and when they came to us for the amount they were selling, we thought this was a deal and we were getting equity for the two we had previously purchased. They said it would be "easy to sell" because of the value and it was so desirable.*

The reality is there is no value for resale. In the presentation, promises were made regarding income streams when renting out extra weeks. With health failing and incomes decreasing, these Plaintiffs desperately needed this extra money and have now discovered that the market simply does not exist for this type of timeshare "rental" income.

When Mr. Stephens lost his job and when Angela Stephens was forced into retirement from her COPD they really could have used the rental income that was promised to induce the sale. Renting was represented as easy and profitable, however it was not and Reps were well aware of this when obtaining contract assent.

*Exclusive Use*

It was represented to Plaintiffs that their unit was exclusive to owners. In fact, the Stephens have discovered that you could book it yourself, or through a travel agency, i.e., these accommodations are open to the public.

*Rescission Clause*

After 4 different transactions, the Sales Representatives never discussed Rescission clause either. On the first sale, the Stephens wanted to close the deal, and on the second and third sale absolutely nothing was said about Rescission. Plaintiffs recall:

*They never explained our right to cancel. I have never heard of this through any of the upgrades. We would have cancelled after the forth sale.*

*No POS*

This Plaintiff is no exception to the rule forged by the Defendant, at all entities and at all levels:

- 27 -

Defendant has never provided even one Public Offering Statement to any of the Plaintiffs herein that was timely before the Timeshare Purchase negotiations and/or contract review and signing, so that the Plaintiffs could read the contents—which obviate certain lies and deceptions, as well as provide certain essential consumer rights, warnings and statutory protections provided under the law—all of which every single Plaintiff was deprived of by such *systematic procedures* that deprive the ability for Consumers to receive their rights and protections in a predatory fashion, along with the Defendant's ingrained *systemic mindset* to Abuse Consumer Rights, as evidenced by Defendant's acts of Fraud upon all Plaintiffs herein.

*Successor Liability*

Plaintiff said "Hell no" to being told by the resort about forced maintenance fee liability to her child and her husband's two children. She said, "life is hard enough already, no way, my kids have nothing, I would have never done this to them.

## *Evette Tribes*

Evette Tribes was 24 years old and her mother (now deceased) purchased the Timeshare, initially from Silverleaf bought out by Holiday Inn, Plaintiff was in the sales office for over four (4) hours and they did not provide them with any food or let them leave and discuss the purchase.

She has owned it over six (6) years, is just now is discovering the full extent of the Fraud perpetrated against her and her deceased mother, and uncovering the undisclosed Liabilities, and like so many, has spent thousands to tens of thousands and haven't even used it more than once, or zero (0) times, as is the case here.

*Buying Paid Down Inventory*

- 28 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The sales rep presented the opportunity as someone who was selling their timeshare, so it was being sold for great deal at only $10,000.  It was paid down by the previous owner, who brought it in to cash out, like a vibrant and flexible unit marketplace.

The salesperson said that they would have one week a year that they can use, but on weekends they could go to the resort in Galveston and use the resort facilities for the day. The Sales Representatives talked about how Plaintiffs could trade in their week and use that to take trips all over the world.

*A Timeshare as an Investment*

Plaintiff and her mother thought they got an exceptional deal split and the cost. The Salespeople made it seem like it wasn't that much money for a lifetime of use.  They said, "considering what you would spend for a hotel this is a great deal" and that those hotel public booking prices would go up over time, but we'd be owners and our price would remain the same each year. These statements were false.

*Valuation and Marketability*

The Salespeople also said it was being sold at well below market values, because someone was selling their timeshare, and it was a one-time deal that wouldn't be available again.  Also, because they were told someone was selling it, the Plaintiffs thought they could resell theirs too.

After the purchase when Plaintiff called Silverleaf, they said, "we don't do resales." However, Defendant Silverleaf did say that the Plaintiff should use an outside timeshare sales company, but she would need to pay off her mortgage first, in order to sell it.  As a result, Plaintiff paid the mortgage off and then found out that all of those companies are scams.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

When Plaintiff called back Silverleaf, at that time they told her that they don't deal with timeshare resale companies (the opposite of Silverleaf's prior advice which was relied upon to pay off the Mortgage).

*Contract Signing and Inheritance*

At the contract signing a professionally dressed woman came in the room and went over the contract with Plaintiffs. Plaintiff recalls:

*She hit the highlights and summarized certain parts, but didn't let us read through the whole contract. It took less than 15 minutes to review and sign the contact.*

*We trusted that with all the questions answered by the Silverleaf Holiday Hills people, that they were telling us what we needed to know.*

*The purchase price was supposed to be **$10,500** but, in the end, it cost us closer to **$18,000**. We have <u>never</u> used the timeshare and my mother passed away. I am a receptionist at a doctor's office and I am expecting my first child. I cannot afford these payments every month.*

*Rescission Rights*

The Sales Representatives, including the contract closer, never disclosed Rescission clause to the Plaintiff. It is thus possible that a cancellation would have occurred had there been notice of such consumer protections, which by itself creates an aura of suspicion, *for questioning: why is the law protecting consumers in timeshare purchases?*

*No POS*

This Plaintiff was not provided a timely copy of the Public Offering Statement (POS) before the Timeshare Purchase negotiations and/or contract, including its execution. Thus, Plaintiff was deprived certain consumer rights, critical warnings and statutory protections provided under the law due to Defendant's purposeful acts.

- 30 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

*Successor Liability*

Plaintiff stated emphatically that the resort people never told them that that the debt would just keep getting passed down to the family, which would have changed everything for them, thus Defendant would lose sales by operating lawfully. The surreptitious surprise of latent contract liabilities buried in boilerplate text (listing *heirs, assigns, successors*…) that assigns debt to generations of family members has profoundly shocked the conscience of all the Plaintiffs herein, and should equally make a profound impact upon this Court to provide the relief appropriate for such predatory and abusive acts.

## *Calvin and Sherae Walton*

The Waltons were about 24 or 25 years old when they purchased their initial timeshare from Holiday Inn but have since upgraded several times. The Waltons were initially enticed to a "free" 90-minute Timeshare seminar, which turned into a five (5) hour high-pressure sales ordeal. After five (5) hours with no food and drink they gave in and purchased the unit. Plaintiff recalls:

*The contract signing was very fast, and she just pointed and said, "sign here, and here and here". No explanation of anything.*

*Valuation and That the Unit was "Real Estate"*

Plaintiff recalls:

*They told us that the unit was valuable real estate that would appreciate in value over time. I really believed that I could sell it like real property and make money because they said it was an "investment". We even listed it for $20,000 and lost $500.00 because it was not worth what she said it was.*

*False Valuation*

It turns out that the points were only worth half (½) the amount promised for exchanges.

- 31 -

*Concealed Costs of Use & Discount Inducements*

Plaintiffs were told that purchasing the unit would be an easy and cheap annual vacation, with easy booking and that booking themselves would be more costly and take more time.  None of this was true.

Sales reps further told the Plaintiffs that they could get discounts on plane tickets and Holiday Inn hotels, but when Plaintiffs tried to go to a Holiday Inn for a weekend and told them they were Holiday Inn Club Members, the Holiday Inn hotel staff had no idea what the Plaintiffs were talking about and they didn't get the promised discount.

Using the timeshare was extremely complicated, however, the reps had said that Plaintiffs can use the unit "anywhere in the world".

However, it is not that simple and there is a significant amount of booking and resort fees included that they were not listed in the calculations performed at the presentation table (a so called: "Deal sheet").

Plaintiffs tried to go to a resort within hours from their home and the fees were another $258.00 (for just a weekend) in addition to what they already were spending on the Mortgage and Maintenance Fees, so it was prohibitive.

*Rescission not Disclosed*

The Sales Representatives, first Andrew, then Pedro, including the contract closer, never disclosed Rescission clause to the Plaintiff. It is thus possible that a cancellation would have occurred had there been notice of such consumer protections, which by itself creates an aura of suspicion*, and questioning: why is the law protecting consumers in timeshare purchases?*

There was no discussion of the rescission terms found in the contract.  As noted previously the salesperson went over a thirty (30) page Timeshare sales contract in only fifteen (15) minutes, merely telling the Plaintiffs to sign "here" without explaining anything

- 32 -

to them about the terms, conditions or obligations. Had these Plaintiffs, or any Plaintiffs herein known about a right to cancel, they could have researched it further within the timeframe to rescind the contract, and such notice may have prompted a Lawyer review of the legal documents involved, where it is highly likely that the Lawyer would recommend that the client cancel the Contract immediately by certified mail.

*No POS*

This Plaintiff was not provided a timely copy of the Public Offering Statement (POS) before the Timeshare Purchase negotiations and/or contract, including its execution. Thus, Plaintiff was deprived certain consumer rights, critical warnings and statutory protections provided under the law due to Defendant's purposeful acts.

*Successor Clause*

Plaintiffs definitely would have recalled any mention of family debt, as explained by Mrs. Walton because of her mother. Plaintiff recalls,

*Because my mom is disabled, handicapped, we are very sensitive to putting hardships on other family members, so we know they didn't tell us your family is stuck with this.*
*We just found out about this with the contracts and our parents, mom had an aneurism and a stroke, and Calvin's parents are both very sick. If something happened to us, they cannot afford this, we're all on fixed incomes, SSD, with no children.*

Accordingly, the couple feels boxed-in by the fraud of a multibillion dollar corporation and victimized by its predatory fraud schemes to extract what little money they have. And their stress levels and physical/medical manifestations, as many of the Plaintiffs herein report, are emotionally draining and physically and mentally exhausting due to powerlessness. To latently discover that you cannot leave this world without financial debt thrust upon your family is actually exacerbating and potentially killing some of these Plaintiffs, ending their lives early because of timeshare-related powerlessness in the form of stress, depression, even

- 33 -

invoking PTSD or other physical or mental conditions. And all of this was created by Defendant Holiday Inn's financial greed without any respect for decency or even human life.

### *Athena and Jantha Williams*

Athena and Jantha Williams originally purchased their timeshare in 2009 and in 2015 they purchased an "Upgrade". The 2015 upgrade **purpose** was to lower maintenance fees resulting from the initial Holiday Inn timeshare purchase.

*Maintenance Fees*

These Plaintiffs were repeatedly told by Holiday Inn Sales Representatives that they would get "lower maintenance fees" from the initial Holiday Inn purchase, and that they were able to use the "equity" from the previous purchase, so long as they bought the Upgrade from Defendant Holiday Inn on that day.

Plaintiffs were told that if they bought the Vermont property instead of the Florida property, their maintenance fees would only be $200 to $300 maximum, which eventually was settled at exactly "$262" instead of their then-current fee of $700 per year.

The *Bait* for the Upgrade was all about finding a place with lower maintenance fees, which the salespeople identified as a "Vermont" property.  Maintenance fees since have risen substantially, over three (3) times the $262 quoted, and even over the previous $700 promised to be lowered, which was the entire reason for the Upgrade.

*Contract Signing*

During the high-pressure sales ordeal, there were more documents signed, but not provided to the consumers, because there were papers missing that were definitely there at the point-of-sale and clearly stated the promised "$262.00" maintenance fee amount.

When they were explaining the Contract terms on the last page it said "$262.00" for maintenance fees, but that was replaced with a document that has "0" dollars on it, and the form with the $262 went missing.

- 34 -

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Additionally, the page where it mentions the maintenance fee amount, it is believed in that during the signing, one of Defendant's Representatives had manipulated the documents: one rep stood over the Plaintiffs and caused them to look back while the other Representative was there with the paperwork, however the form signed in actuality would have been the *switched document* that does not say "$262" as the agreed fee amount as seen by Plaintiff, but rather "0" dollars *switched document*.

*Contract Interpretation*

Plaintiffs had the sales contract interpreted to them by non-Lawyers and the rapid Interpretation and Advisement to sign thereupon, was done in a deceptive fashion. Defendant's Representatives delayed Plaintiffs for an exorbitant amount of time preparing documents to sign, which frustrated the Plaintiffs by design because they were on vacation, where the Representative then suggests the consumers go the pool and he would bring the paperwork to them.

The Plaintiffs were left at the pool for some time, and  at once instructed to enter into a room with by a lady and man that were *closers* posing as finance officials of some sort; however, they really didn't go over financing, it was extremely fast process—they stood the whole time—with a concise and very broad verbal summation of the Contract's supposed benefits (legal terms purportedly in the Contract) and then showing the Plaintiffs where to sign or initial as needed.

*Future Valuation and Resale*

Specific questions were raised by the Plaintiffs about future resale of the Vermont timeshare (the Upgrade), and specific misrepresentations were made by Holiday Inn Reps, directly on-point to the resale-ability of what Reps portrayed as a *valuable piece of property*.

The Williams specifically asked the representatives if selling in Florida was easier than selling in Vermont, and they fervently said: "No" and that they both get top dollar fast.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

They told them it was just less upkeep than Florida which has more pools to upkeep, but nothing changes about the ownership value.

Plaintiffs were repeatedly told by the Holiday Inn that this was a "great investment" with profitable resale values.

Plaintiffs thought the Holiday Inn staff does this all the time, so they must know what they are talking about, and Plaintiffs were told and truly believed they had received "equity" from their previous Holiday Inn timeshare's "appreciation" and could sell the new one too (someday) for a similar profit.

Plaintiffs trusted the Holiday Inn staff and because they had done business with them before and made a profit ("equity") and thought they would be honest experts concerning timeshares in general, and particularly with regards to the Holiday Inn staff and management Upgrade statements concerning values and resales.

Plaintiffs were told that they owned and were then purchasing a very "valuable investment" in "Deeded property", that has a substantial "<u>IRS tax write off</u>" as well. All such representations were false & deceptive.

*The Timeshare was "Real Estate"*

Plaintiffs were told that they would own a specific piece of valuable real estate that they could easily sell whenever needed. Using all the right words to gain Contract assent, Representatives made assurances that were simply false. This young family was told that this was an "opportunity" *to make a safe investment* with "appreciation" as explained, and as seemingly derived from the prior sale's "equity" used in the second purchase, which appeared from such representations to be a safe and profitable investment.

*Rescission – POS*

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Neither the statutory consumer rights for Rescission, nor the Public Offering (with its inherent disclosures and consumer protections). were effectively disclosed to these Plaintiffs, and as such they join prior Plaintiffs evidencing factual violations of legal consequence.

*Successor Clause*

Plaintiffs were totally unaware of the extent of familial liability through the Contract's "successors" clause.  It was represented in discussions that this timeshare was beneficial property unit that "**could** be passed down to their children."

For all Plaintiffs herein, there was no mention of the contract's defeating provision where mortgage or fee liability is forced upon "successor" children under the Holiday Inn Contract, wherein a child and/or children [severally & jointly liable] or other family members in the lines of succession, would upon the last owner's demise, be bound to all financial obligations under the Holiday Inn Contract, forever, generationally, or fight a multibillion dollar giant with fraud victims who are silenced by the grave, along with their defenses. The truth of such obligations were never mentioned, only indications that this was a "safe and valuable asset" to be put in a Will, giving *options* and *choices* fully within their control to decide whom to leave their timeshare to.  The Plaintiffs were never informed that the contract had forced debt liability, and they clearly state that they never would have entered such an agreement.

## *Vincent Yi*

Vincent Yi was only 23 when he was convinced to buy a timeshare, and he is now a retired as a Navy Veteran with a Silverleaf timeshare.  He attended a timeshare presentation based on the premise that he won a "free" vacation.  He was told he had to travel to Massachusetts to pick up his prize.  He was never told the trip would entail a presentation on timeshares.

- 37 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

*Sales Presentation*

Mr. Yi took an all-day bus trip to Massachusetts and back thinking he had won a vacation. Upon arrival he was told he had to attend a ninety (90) minute presentation that turned into a four (4) hour sales presentation.

Plaintiff recalls:

*The salespeople were very pushy. They kept selling and I kept saying "No". Then the salespersons manager came over and pushed me more. I kept saying "no" and they kept asking how much are you putting down? I said "no" and tried to leave. Finally, I just gave up just to get out of there.*

*Cheap Vacations and Exotic Locations*

Plaintiff was told that buying a timeshare would be a cheap annual vacation.

Plaintiff said he was interested in global travel and they said, "you can get a place anywhere, anytime, we have resorts all over the world!"

They also said that the trading exchanges were included with the timeshare purchase. Plaintiff recalls: *After purchasing I asked about the free trading use and they said it had expired.*

*Contract Signing*

Plaintiff's entire contract signing of volumes of paperwork was done in less than fifteen (<15) minutes and overseen and conducted by a <u>Silverleaf Staff "Attorney"</u>. Plaintiff recalls: *She went through everything real fast and didn't explain very much.*

*Business Discount*

They had it priced at $30,000 and then $15,000 and then brought it down to $8000 just for Mr. Yi's fledgling real estate business. Reps promised multiple bookings (a lie) to supposedly promote his business with the timeshare.

*Value, Appreciation, Profits & Rental Income*

- 38 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Plaintiff was told that purchasing a timeshare was a good deal. The sales person said that he owned the same timeshare and that it was a "hot on real estate market".

Plaintiff was told the unit would only go up in value and that if he sold it tomorrow he would make a profit. Plaintiff recalls being told the unit had "built in equity" and that rental of the unit for just a week would make a profit.

Preying on this young consumer's new found career after retiring from the Navy, Reps created an illusion of the ability to provide vacations for his business customers to be even more successful, and long-term sales profits.

Plaintiff recalls:

*There was a rep, a manager and a Silverleaf Lawyer on-site to sign the contract with. I tried to google on my cell phone to see what I was getting myself into, but there was no service at all.*

*My heart said "no" they were so pushy I finally gave up, the manager was really high-pressure, he just kept asking for a down payment. They didn't even do a credit check, I am clearly in debt with student loans, I do not make a lot of money.*

*Then I was passed off to the Lawyer and she was saying "this page means this and this", and she barely skimmed through it. I felt like she was explaining everything like she was supposed to be looking out for us.*

*I didn't realize then she worked for them. I didn't ask to have an attorney because I was signing the contract with one.*

Besides obvious Predatory Lending tactics, the issue here lies in whether this was an actual Attorney or a de-facto legal advisor interpreting the contract for Mr. Yi. Both have dire consequences for the Resort. The latter is at the fundamental core of Justifiable Reliance, in those holding themselves out to be experts. This transaction was quite possibly taking place with a Lawyer impersonator and de facto Legal Advisor who explained the

- 39 -

documents and what the legal content supposedly said. Such acts would constitute contract Interpretation and Legal Advisement performed by a non-lawyer, which creates an Unauthorized Practice of Law (Gross Misdemeanor or Felony in many jurisdictions). And, such violations can be actionable on a civil basis, or support and evidence the underlying case for Fraud, as here.

If it is a licensed "Attorney" who chose to disregard her professional responsibility by fostering Fraud within this transaction, then that Lawyer would be responsible for the transgressions committed against Plaintiff and expose herself for Lawyer discipline.

As to the fact that Mr. Yi could not utilize his cell phone in the *Deal Room*, operation of transmitters designed to jam or block wireless communications is a violation of the Communications Act of 1934, as amended ("Act"). See 47 U.S.C. Sections 301, 302a, 333. The Act prohibits any person who willfully or maliciously interferes with radio communications of any station licensed or authorized under the Act or operated by the U.S. government. 47 U.S.C. Section 333 (modern adaption - cell phones). Civil and criminal penalties apply and any offending device used may also be seized and forfeited to the U.S. government.

*RESCISION – Statutory Violations*

*Deadline Preemptive Extension*

Through a rapid contract signing, this trusted "Lawyer' conveniently failed to inform Mr. Yi of his statutory Right to Rescind this contract in the state of Massachusetts. Yet, upon returning home and uncomfortable with the purchase, this young, resourceful consumer found a way out, only to be unlawfully denied of this very right that the law has provided for him.

Plaintiff reveals:

- 40 -

*They never verbally explained my Right to Rescind. The next day I started looking over the contract and even the first page said I could cancel and so I called right away. I tried to cancel within 3 days because I saw on the contract I had 7 days and I told them I had made a mistake, I need to terminate. The guy sounded so drunk and he laughed and said it is all yours, you are stuck with it and hung up, they just refused to help.*

Evidence of telephonic communications shall verify this conversation involving statutory noncompliance in violation of Massachusetts General Laws chapter 183B, §38. The Right to Rescind never passes for Fraud, where Rescission still is the proper remedy to cure the harmful effects of this contract induced by Fraud, UPLs & violations of State & Federal laws.

*Rental & Sales Profits*

Plaintiff recalls:

*I could rent a week to other people and make extra money or sell it and get rid of it, this was their biggest pitch.*

*They said selling would be easy because they had one and people can buy and sell them. They said they use theirs every year, that's why people want these for great vacations. And, they are desirable so they go up in value and you can sell them for that profit. So, if I sold I could make money that way with all the appreciation. Or, I could just rent the weeks to my friends and make money yearly that way.*

This appears appropriate for Judicial Rescission under State Law in Massachusetts, §93A-2 provides that unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful, added to §183B- §5, where **a court, upon finding as a matter of law that a time-share contract or contract clause was unconscionable at the time the contract was made, may refuse to enforce such contract [Judicial Rescission].**

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

Besides the injustices that would render this contract Unenforceable in alternative laws, the entity is operating in Massachusetts thus subject to the burden of Massachusetts law. There were numerous unfair & deceptive statements that were made intentionally.

*No POS*

The Plaintiff was not given a Public Offering Statement (POS) to review prior to the purchase at all. The Plaintiff did not have the POS before contracting for the purchase of a timeshare.

*Successor Liability*

As a young single man the sales reps would only talk about leaving this asset to children sparingly, however, Mr. Yi has made his statement very clear: "I wouldn't have done this if they mentioned the forced debt, I never would have signed the contract."

## *Zane and Kalonna Zeigler*

The Zeiglers are both highly decorated, active, Air Force combat veterans with four (4) commendations between them. They purchased their timeshare in 2013 from Silverleaf, while on vacation. They were invited to "spin the wheel" for a "free" vacation. The "free" vacation was a two (2) day, three (3) night stay in San Antonio and one (1) hour long meeting that morphed into a long and tortious timeshare presentation, where after numerous hours with salespeople and wanting to leave, they relented and purchased Defendant's timeshare.

Plaintiffs recall an extremely high-pressure and stressful sales meeting and being told that "if they did not purchase today they will never be allowed to purchase a timeshare from the company again". Plaintiffs told the salespeople they wanted to leave to discuss the purchase privately, but the salespeople ignored them.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

One month after purchasing salespeople called and offered an "Upgrade" which they purchased. With the upgrade they were promised easy booking and exclusive use and bonus points.

Plaintiffs were also to be "grandfathered" into the resort as a "Diamond" level owner. The upgrade was to provide them with multiple lodging opportunities at no cost.

However, the only time they could book with the upgrade, the booking was next to impossible to accomplish and with fees.

*Contract Signing and False Promises and No POS*

Plaintiffs recall the contract signing went very quick, 10-15 minutes, with the sales representative merely pointing at the contract and asking them to "sign there".

They received a CD with numerous documents on it (probably a late delivery of the POS), but were not allowed to review the documents prior to or during the presentation.

They were promised bonus points toward exchangeable resorts, along with ease of booking. The Plaintiffs were also promised that the timeshare would sell quickly and easily. But, the bonus points were not enough to use to exchange, and the booking was very difficult, and when they attempted to sell, no one made them any offers.

They were told it is an "investment for their family" but they ended up with tens of thousands in high interest mortgages and fees, and impacted their ability to buy a home.

The Zeiglers are victims of *"levels-fraud"* when the resort throws in terms/names that have elastic definitions that the reps redefine as see fit to create desire for the "Upgrade", like here with *Red* and *White* levels, and then a "Diamond" level and a "Presidential" level with exclusive opportunities to get "grandfathered" in a level or cost, program or a feature like "brand new" v. "pre-owned" units, none which they will ever see again after the tour.

- 43 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

At the point-of-sale, Plaintiffs saw pictures of Ireland resorts they could go to for a week, but not for their points.

They were told that family and friends can use the timeshare anytime, anywhere, but the reality is they have to go on only the week we own on some document, and the owner (one of the Plaintiffs) has to be present when the family or guests stay, however the Plaintiffs were not told these restrictions at the point-of-sale.

The Zeiglers were told their unit was from an owner resale (suggesting a marketplace) who upgraded and there was super special Bonus Time that actually worked and was not offered anymore.

*Rescission*

The Zeiglers definitely know that the resort did not tell them about an ability to rescind the Contract. They now know it is 6 days under Texas law and were sure that was never told to them when they bought or when they upgraded (either Upgrade).

*No POS*

There was no meaningful examination of the Public Offering Statement. Here, the Plaintiffs were given a Big Binder after they signed the Contract, and no copy was provided before that.

*Successor Liability*

Plaintiffs through legal counsel recently discovered that their children would be responsible for all of the timeshare debt when they died, including ever-rising maintenance fees. But their understanding from Defendant reps was that it was a "great investment for the future" which "**can be** passed down to your children and then your children can vacation forever."

It all sounded free and easy to the consumers at the resort when they bought, but the Plaintiffs learned the truth of the family liability for debt, and that was entirely new

- 44 -

information that disturbed them immensely. One Plaintiff exclaimed that they would have immediately "walked out that door."

*No Value – No Decency*

The Ziegler's, now facing financial issues and both suffering from PTSD, attempted to sell their timeshare with a company for a $500.00 sales fee, but there is no value.  When the timeshare did not sell they next attempted to have their maintenance fees reduced by Silverleaf.  Defendant merely offered to give these fraud victims—who are also War Heros—active US Air Force combat with four (4) commendations between them, a trifling $20.00 off as a "military service discount."

## *Cecilia Iliesiu*

Cecilia Iliesiu was about 22 years old when she was manipulated into buying a $42,000 timeshare in 2015 from Defendant Holiday Inn (while she was on vacation with her parents).  While booking a reservation for her parents she was offered a "free night stay at a resort" for being a "valued" customer.  Iliesiu was unaware that she was attending a timeshare presentation.

*Sales Presentation*

Plaintiff and her parents attended a 4-Hour high-pressure sales presentation. Salespeople represented to her that the timeshare was a value and that the "points" she was purchasing would be transferable for guaranteed resort stays worldwide.  The salespeople said the price would double or triple in the future and that they needed to buy now or the Plaintiff would miss out on tens of thousands.

"Use" was all about flexibility of time, destinations and accommodations, where reps stated there was "no restrictions or black-out dates" because they were guaranteed hotel stays, but in reality this was all a pretense to obtain the Plaintiff's contract assent.

- 45 -

1    Discounted Flights and cruises were also part of the deal and they were told that if

2    they wanted to sell they could do so with the help of a real estate agent and that the unit was

3    actual "real estate".

4    From flights to cruises to real estate, all the assertions were untrue.

5    By the time it got pressured there were 4 sales reps surrounding their table tag-

6    teaming to handle any possible objections.

7    This young owner had paid over $10,000 and then began to discover the Fraud she had

8    faced and the financial consequence she is suffering.

9    Reps said the market resale value will double or triple in the Plaintiffs life and she

10   can sell the unit whenever she wants to make a big profit, but now Plaintiff knows the

11   timeshare is not worth a dollar, in the real-world market of today.

12   *Relative Value*

13   Plaintiff cobbled together her points for her $90,000 "investment" with high interest

14   and rising fees after 10 years. She has already lost $10,000 cash and got only one hotel stay

15   at a Seattle area Holiday Inn Express – which is really just a freeway-type motel.

16   The cash calculation is easy, 4 nights divided by $10,000 is **$2500/night** for a

17   freeway motel.

18   The obligation amount is even higher. Since 2015, 4 nights or about 1.5 nights per

19   year for 3 years, so over 10 years, the total use would be 15 nights or roughly about 2 weeks,

20   so that Holiday Inn Express freeway-type motel costs **$45,000 per week** as an "owner".

21   And even if the calculations *were* half wrong, the idea of a HI Express for over a

22   $1000 a night, or over $20,000 a week is Unconscionable (Rescission grounds).

23   Though this is an absurd result, it is true, and likewise, there are other absurd and

24   outrageous cost-for-benefit-derived financial result that can be shown to exist in all the

25   Plaintiffs matter herein.

26

27                                             - 46 -

*Contract Signing*

The contact signing was very short, and the salespeople merely walked them through the contact telling them abruptly to "sign here" and "initial here".

The signing lasted about five (5) minutes and Iliesiu was not allowed to read the contract before signing it.

*Deal not what was Represented*

After purchasing the timeshare, Iliesiu used the unit once and was told she could not use it again because she had run out of points. Booking was challenging, but eventually she got her 4 night stay, but they charged her fees even though she was told that stays would always be free of charge by the original Holiday Inn salespeople.

Iliesiu attempted to sell the unit, but was told it was not real estate and not valuable (as represented), and it did not sell.

*No POS*

The Plaintiff was not given a Public Offering Statement (POS) to review prior to the purchase, with adequate or any time to review prior to their sales-oriented discussions or the actual purchase and contracting for the purchase of a timeshare.

*Rescission*

Furthermore, Iliesiu was also not told that she could rescind the purchase at the contract signing and did not find out for some time.

*Successor Liability*

She found out long after the purchase, the truth and extent of certain transferable liabilities, namely, that when she dies all of the obligations for the timeshare would be transferred to her "successors" in interest, which was not explained at contract signing. She was directly told, "They said I **could** put it into my will and they made it sound like an

- 47 -

amazing investment. They did not tell me about automatic debt going to my relatives and I suppose that would have ended me signing up.

### *Douglas and Kathy Leger*

Mr. Leger (66) and Mrs. Leger (52) purchased a timeshare in 2014 from Silverleaf and then upgraded the unit in 2015.

*Sales Presentations*

Two (2) sales presentations lasted ten (10) and four (4) hours respectively. During the upgrade presentation they purchased exchange rights and were told that they would be able to use the finest resorts around the world and amenities as an "Ambassador" member.

Plaintiffs were also enticed by a $19,000 unit that had been previously discounted $48,000 and were told if they did not upgrade today, the deal would not be offered again.

Plaintiffs were further told that because they were in a business that they could legally sell some of their points for a profit and/or that they could rent their weeks out and make money (all untrue).

*False Representations*

The places they were assigned were deficient: "paint peeling, drawers not working, rickety stairs, just awful". Plaintiffs asked about getting better accommodations because they had purchased them, but Defendant's staff told them it was a "first come first served" policy and that because they came on a Saturday, all the "nicer" units were booked. They have never used the actual unit purchased, although they have used the "bonus" time, but the bonus time assigned was not the "Ambassador" upgraded unit represented to them at the sales presentation.

Sitting through a combined eleven (11) hours at two (2) high-pressure sales presentations, these Plaintiffs were sold a second timeshare that was misrepresented.

- 48 -

Had <u>cell phone</u> service not been blocked, perhaps they would have discovered the trap they were being led into instead of accumulating a large consumer debt.

*UPL Contract Interpretation/Advisement*

Plaintiff recalls:

*The presentations were very high-pressure and they would all be talking at once.  We must have talked to 3 or 4 people, it was awful.*

*When signing the contract, it was a person with a notary.  Once we got to the signing it was fast, they interpreted it very broadly, here is what this says, just sign.  They went through it very quickly and it was very overwhelming. Our head was spinning.*

Attorneys-in-Fact, Kat Ruppert and Kimberly E. Jasso, performed unlawful UPL acts or furtherance thereof by advising Plaintiffs an interpreting legal terms of the parties' Contract.

Reassurances were made that this new Contract [what began as an Upgrade] offered added benefits to levy an additional $17,000 of consumer debt.

Plaintiffs were told that if they bought the "Ambassador" unit, whenever they go, they would get the best accommodations.  Plaintiffs thought the second purchase was an Upgrade with more benefits, they did not know it was another Contract at all. Plaintiff recalls:

*He made it sound so much better and we would have so many weeks and they were top of the line resorts.  He said if we don't sign today they would not be available later.*

*They told us when we go to book bonus time as the highest level owners we would get the highest level units, but when we were checking in they were telling us*

- 49 -

*first come first serve, so whoever shows up first gets better units. Most people come on Friday and we couldn't get there until Saturday, so the good units were gone.*

*We went to book one of these resorts as an exchange that was supposed to be a good deal, and it turned out with all the extra fees, even as owners, it would have been cheaper to book online.*

*We do not get better accommodations because we ended up in the rattiest units, paint peeling, drawers not working right, rickety stairs, it was just awful. There was no point to the second one and we did not get anything like the Ambassador suites like they had promised.*

*Business Promotion Tool/Rental Profits*

The Legers had a business, and Reps assured profits through easy rentals and point usage for the owners' business customers. Plaintiffs recall,

*They told us with our business we could use our points and rent some of their units that way and make money through the exchange company and our weeks.*

*We could also rent our weeks out through the company and make money.*

*They told us that renting these units was so easy, especially the week we had because people were just standing in line for it and we could even make money.*

*Turned-in Deeds – Equity & Profit*

With specific high values being thrown around by Reps, consumers felt they could not go wrong. They were to obtain a 6-figure timeshare for less than a quarter of the market worth. Plaintiff recalls,

*They told us that these were deeds that had been turned in for upgraded units. They had turned them in for a higher unit and they needed by law to get rid of them for what was owed against them.*

*With the price we were getting it at it, it would be no problem to sell it and get our money back from it.*

*The first one should have been sold at $48,000 and we got it for $19,000 so it was a steal. We could sell it later on for a profit.*

*It would be easy to sell and at the price we were getting it at, especially the Ambassador, they sell for over $100,000 so we would definitely get some money off this transaction when we sold.*

*I was thinking, what do I have to lose. It was worth more than what we were paying and we could sell it and it was property.*

In actuality, there is no market resale value or market at all to resell this timeshare [not even pennies on the dollar], as this is simply a negative value timeshare [these timeshares are one-sided debt instruments providing nominal, if any in some cases, service fulfillment].

The market values of these timeshares at that exact point-of-sale [zero without debt, thus Negative Value] harbor statistically dispositive proof of fraud.

*Successor Liability*

During the discussions/presentations Plaintiffs were told that this timeshare was valuable and could be willed to the Leger's children.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

There was no mention of the Contract's provision for forced inheritance by a "successors" clause provision (in the Deed), wherein their family would upon their demise, be bound to the financial obligations under the contract.

The Rep made claims of a valuable investment-grade Asset in relationship to the ability to Will the property to the consumer's family. This was explained as something valuable that could be passed on to whomever they choose.

This was on-point discussion on this specific timeshare contract, the consumers' family and their relationship to ownership and will & estates.

However, there was no counterpart disclosure regarding exactly what perpetual timeshare ownership [i.e. successor liability] involved.

Nor was there any disclosure of the ultimate impact of the successors clause upon that same "family", whether or not they "willed" the property to them.

## *Ronald Lewis*

When Ronald Lewis purchased his timeshare he recalled being with his girlfriend at a football game and was approached by someone asking if he wanted chance to win a free vacation. He registered and won, then several weeks later he was called to visit a Silverleaf Resort.

*Sales Pitch*

Mr. Lewis recalls from the minute they entered the sales area it was high-pressure for the entire five hours (a five (5) hour presentation session), which as marketed as up to ninety (90) minutes. Plaintiff recalls:

*We started with a female sales person, who was not getting "no" responses from us.*

- 52 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT; VERMONT CONSUMER PROTECTION ACT

*Then she called over a rep named Jarod who upped the pressure significantly. He was trying to find something that worked. When I said, "I didn't understand it" he said "we will find something that will make sense."*

*Jarod then showed up with a $14,000 unit discounted from $60,000.00. The unit looked nice. And Jarod said it would not be recorded on their credit report, but that it was definitely "real property."*

*He also said we could use it to trade worldwide or make cash now if we, "sell it, or rent it out to make money."*

Defendant Silverleaf reps said specifically that if the Plaintiff ever wanted to cash-in, to just bring it to them and they would sell it for the Plaintiffs. All of these statements were untrue.

Plaintiff said some things including numbers did not make sense, and the management rep would say he will find something that does make sense.

*Foreclosure Property - Equity*

$60,000 of market value was found on a *property that was just "foreclosed"* and selling today for only $14,000, because the old owner had paid it way down and there was $46,000 in equity. Reps said you can always sell it or turn it back in.

However, this is a zero dollar ($0.00) timeshare.

Reps further said, "you can transfer it to your bank for better interest rates". No bank would probably ever loan on a $0.00 timeshare.

*Point Valuation Bait & Switch*

Plaintiff recalls,

*I thought I bought a 2 bedroom for 2 weeks, a point a day, or 14 Points for trading, but we need 80,000 Points or more points for 2 weeks in a 2 bedroom in nice places like we had talked about in the beginning.*

- 53 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

This Valuation would represent only .0175% of the promised accommodations and amenities. And again if it is half wrong, it is still about **.035%** of the promised Use Rights that are fulfilled (mathematical analysis).

*Contract Signing and Post Purchase Revelations*

The Contract signing in this matter was rapid and directed and fully controlled by the Defendant's sales representatives. Plaintiffs recall,

*The contract signing was really quick, they would read a line and say, "sign here", or "we have already explained that to you, you don't need to read that!" I was trying to read the pages and they kept moving forward as fast as they could. I was tired by the end of the five hours and was just looking for something to get out of there.*

After Ronald Lewis purchased the unit he tried to get out, but the Defendant's staff and managers said "no". Then he asked them to take it back and they again said "no" again despite prior promises to do just that.

The property was in Branson, Missouri, which is far away from him and he would never go there. Lewis did use a trade for 1 trip to the Bahamas, but the resort was nothing like they showed him during the presentation.

*Valuation – Cost Analysis*

It cost Mr. Lewis $3,500.00 for the trip and he stated, "Looking back, the resort was a rinky-dink place, off season, low-end property" [$1000/wk. max?], and "I believe that I could have done better by booking it myself online."

The true cost is one (1) use in five (5) years, so in ten (10) years he will have paid about $40,000 for two (2) stays in "rinky-dink places" or about **$20,000/wk.** after high interest and inflating fees are calculated in. *And even if we are half wrong*, that's still

- 54 -

**$10,000/wk. for a 2-star? Or, ten times (10x) the going rate** on *Expedia et. al, for the privilege of being "owners"*.

*IRS Tax Law Advice*

*It requires a lawyer to interpret tax code, Defendant's staff explained how to tax deductions for all interest paid; however, his CPA and our Tax Lawyer disagree with that.*

*Rescission and No POS*

The Plaintiff's immediate answer involving Rescission discussions at the point-of-sale was: "No, never had this conversation." And, The Plaintiff did not get a POS to read before the purchase.

*Successors Liability*

Plaintiff recalls,

*They said I can do anything I want with it. Give it to my kids, my family or I **could** put it in my will.*

*If I had known about passing debt on automatically, I would have absolutely not done this.*

## *Lisa and Joe Manno*

Joe Manno (56) and Lisa Manno (53) purchased their Silverleaf timeshare and were upgraded several times after their initial purchase.  They were sold their most recent upgrade while staying at the Holiday Hills Resort and attending an owners' meeting. The Manos were inquiring about how to stabilize their increasing timeshare costs.

*Sales Pitch*

The Mannos over-extended owners' session lasted for several hours.  The salespeople were touting the purchase of more *"point's"* for use to the Manos existing "property".  They told the Manos that buying additional points would be cheap, flexible, and

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

significantly, by paying the down payment for the Upgrade, there would be no change to the existing rates.

Additionally, with more points everything would be better, there would be very low cost cruises, nicer places to stay in Hawaii and out of the country.

*Post-Sale Truth*

Most everything that was told to the Manos during the sales presentation was untrue. The points cost far more than if you book on your own, there was a fee for trading points that was not disclosed, and use was "first come first choose" so it was not exclusive to them, nor any value at all to them, including lied-about resales.

The resort doubled their maintenance fees by making a mere rule change. The Plaintiffs had a split unit, and the Defendant just unilaterally changed the preexisting terms of the Contract… by adding a 100% increase in the fees and doubling Plaintiffs' costs.

The Mannos were told they had built-in equity because of the price they received from an old owner resale that had brought the unit price down. And further, the market value was only going to go up, so more equity was to be made (per Reps).

However, booking a unit was extremely challenging.  It was represented to them that the Upgrade would guarantee them a "Diamond" status, which they were paying for and that other people could not get the deal they were getting.

However, the harsh reality is that the costs for the Manos maintenance fees also doubled, despite the freeze they were told about, which was the primary reasons they attended the owners' meeting and was the only thing on their agenda. And ultimately due to false claims by Defendant's reps, it was the Plaintiffs' reason to upgrade to stabilize their out-of-control timeshare costs.

*Successor Liability - Contract Signing – Rescission - POS*

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

The Mannos specifically can recall that they were not informed of the "successors" clause in their Contract, and had they known that their children would be responsible for any money to maintain the unit after they passed, that would have been a deal breaker for them. They recall being told it was a "valuable asset, not worthless debt" [ironically]. And that, this would be a "benefit for future family members."

They also recall the Contract signing as "rapid fire" without much explanation of the terms and conditions.

The Mannos were also not told about rescission and that they could get out of their Contract after the sale.

Nor were they given a Public Offering Statement (POS) to review prior to the purchase.

Furthermore, resale claims at the point-of-sale could never produce the promised profits of many thousands of dollars but the reality is Defendant's timeshares have historically, and now currently, do not sell for even $1.00.

**E.**

## **VERMONT CONSUMER PROTECTION ACT**

The claims presented in this complaint are subject to the Vermont Consumer Protection Act entitling Plaintiffs to attorneys' fees and because this litigation is brought in the public interest and confers a benefit upon the public.

### **CAUSES OF ACTION**
(Against All Defendants)

### **SECTION I**
### **FRAUD, CONTRACT RESCISSION**
Abusive Sales Practices - Predatory Lending

- 57 -

1.1     Plaintiffs incorporate by reference, as though fully set forth herein, preliminary Sections "A", "B", "C", "D", and "E" of this Complaint.

1.2     Each of the Plaintiffs were induced to sign certain documents which have been alleged by the Defendant to form a "contract".

1.3     Plaintiffs have incurred substantial damages in connection with the purchase of their timeshare, and damages continue due to ongoing maintenance fees, mortgage payments and/or other charges under the terms of such adhesion contracts which are borne from unconscionable procedure and form a substantively unconscionable result.

1.4     The total cost of the timeshare, per a Truth in Lending Disclosures (and the ever-rising annual maintenance fees), is in the hundreds of thousands. These loans have interest, that nearly doubling the principal.

This huge amount of "investment" is paid for: promised resale, appreciation, rental income, and opulent vacation "use rights".

1.5     However, they are contractually not the same rights that the Plaintiffs were promised to induce the sale. Later on they learn that booking reservations is a near impossibility.

1.6     Defendant discouraged some Plaintiffs from having an Attorney review the timeshare sales contracts before the Plaintiffs would execute the contractual documents committing them to the purchase and the associated debt.

1.7     Defendant prevented any meaningful review of the Contract from each of the Plaintiffs, and instead supplanted *Contract Interpretation* of the legal terms of the Contract by its Lawyer or by a non-lawyer, perpetrating an Unauthorized Practice of Law ("UPL"), and equally, the *Advisement* by a non-lawyer to sign based upon such interpretation.

1.8     In all cases the Defendant's Lawyer's (real or de-facto) did not tell the truth about talk terms they were interpreting. These F Contracts were committing Plaintiffs to the purchase of the timeshare involving hundreds of thousands of dollars in short term and Generational Debt.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1.9   <u>Duress</u>: Defendant essentially held Plaintiffs against their will for usually about 4-8 Hours, [**11½ Hours** is the longest herein] during high-pressure sales presentations claimed to be ninety (90) minutes or less (sometimes, "a few minutes for an owner's update"). Significantly, none of the Plaintiffs were ever allowed to speak to counsel or leave to talk among themselves.

1.10   <u>Undue Influence:</u> Defendant's tactics, grueling hours long sale pitches, lack of access to an attorney or the basic knowledge of the timeshare business, coupled with aggressive sales tactics (*Predation* in some cases because of age), led to these plaintiffs being placed in a situation where they were susceptible to Defendants undue influence.

1.11   <u>Bait & Switch</u>: All Plaintiffs were told that the timeshare transaction was economically advantageous to Plaintiffs, often called a "good investment" or an "asset" that Reps say, "is only going up in value" (Appreciation), which is disproved by statistically dispositive evidence of fraud concerning the market value as of that day (it was non-existent, zero dollars, <u>not</u> selling for $1.00).

1.12   <u>Economic Impact</u>: The chief economic effect on Plaintiffs entering into the written contract for the timeshare was to obligate them by means of deceit to a high-interest mortgages and ever-rising [and perpetual] maintenance fee payments.

1.13   <u>Generational Liability</u> is surreptitiously formed via a "successors" clause hidden from consumer detection in boilerplate text of the Contract.  This is an unending economic obligation (to obligate one's progeny [the future lines of succession], as successors in interest). This one act is Deceitful and Unconscionable enough to adjudge the paper a ***nullity*** and render judgement for the aggrieved parties, including Contract Reformation to permit the Plaintiffs to recover Punitive Damages to punish & deter such future acts.

1.14   <u>Justifiable Reliance</u>: Plaintiffs reasonably and in good faith believed in the truth and veracity of the false representations made by Defendant's <u>timeshare experts</u>, which induced

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

the Plaintiffs herein that were unknowledgeable about Timeshares and their values, to enter into far different [than promised] paper "contracts".

1.15   Plaintiffs are entitled to Rescission (and Reformation) of the contract, particularly since these cases show a history of fraudulent representations by Defendant as to: (1) resale value, (2) successor liability and (3) related UPLs, as well as, (4) invented rental incomes, and (5) falsified use rights, which are common to most of, if not all of the Plaintiffs in this matter.

1.16   As part of the remedy of Rescission, the Plaintiffs are entitled to recover all funds that they have paid to Defendant in connection with these timeshare purchases, to put the parties back in their respective pre-contract positions, as if the *nullity* had never occurred, and/or Reformation to make Punitive Damages found under an applicable remedy possible by reforming the fraud contract to permit the aggrieved parties to avail themselves of such relief.

1.17   Plaintiffs had to retain counsel to prosecute this action, and should be entitled to attorney's fees, costs, and other just relief, such as prejudgment interest for sums of money the Defendant has been unjustly enriched by.

1.18   Facts supporting this Rescission claim are *pled with particularity*, done individually for each Plaintiff to this action [See Section "D" - PLAINTIFF FACTS]

## SECTION  II
## - UNAUTHORIZED PRACTICE OF LAW -
Contract Interpretation and Advisement by a Non-Lawyer

2.1   Plaintiffs incorporate by reference, as though fully set forth herein, preliminary Sections "A", "B", "C", "D", and "E", as well as fully incorporating paragraphs 1.1 through 1.18 of this Complaint.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

2.2    Unauthorized Practice of Law (UPL violations) are an independent cause of action and can also support other causes of action where UPL violative conduct is intermeshed with Fraud.

2.3    UPL conduct supports claims of fraud pled in the particular, where exact details are given about the Defendant's UPL violations that Plaintiffs herein encountered [Section D].

2.4    Therefore, are pled with Facts supporting UPL claims (Wills & Estates law and/or Contract Interpretation and Advisement) *particularity* for each Plaintiff to this action [See Section "D"- PLAINTIFF FACTS].

2.5    These UPL acts came in two forms: **(a)** interpreting legal terms of the contract and advising consumers to sign/initial thereupon, and **(b)** interpretation of laws regarding Wills & Estates, while not disclosing defeating terms known to be in the Contract:

(a) In the first form, their *de facto* Lawyer explains the legal terms of the Contract and states what it really means, as opposed to reading the terms of the contract aloud, or providing copies, and/or permitting the consumers to read the Contract.

(b) In the second form, consumers are told about how they can plan their Estate with this new "Asset" to leave a "Legacy" to their child or children (or anyone they choose) using a "Will" while fraudulently concealing known "successor" clause liability located in the timeshare purchase contract that forces obligations upon future generations (who are jointly & severally liable for the ever-rising debt).

2.6    The signing is orchestrated by a "Closer" called a Loan or Compliance Officer, or Defendant's Attorney, which after, often 4,6,8 or 10 1/2 Hours, of mentally & physically wearing the consumers down in the sales room, there is a rapid signing of many documents that lasts only about 10-15 minutes.

- 61 -

2.7    The entire process is controlled from start to finish by the Closer, and Consumers are not permitted to read the contract, nor permitted to leave the room, nor to discuss the contract alone, and they are not permitted to review the contract with their own Attorney.

2.8    Consumers are also not permitted to take the contract and come back the next day, and they are forced to sign the contract that day or they will be deprived of many thousands of dollars.

2.9    The Closer artfully says "*this means…*" and "*sign here*" and "*initial here*" to get these completely exhausted, hungry, physically tired and mentally drained Consumers back to their vacation, which constitutes a UPL for Contract Interpretation of legal terms and Advisement to sign thereupon.

2.10   However, a greater evil lurks within, because the non-lawyer's interpretations were untruthful. These false interpretations of contract terms were used to deceive the Consumer-Plaintiffs herein.

2.11   In the end, it appears as if Consumers are signing and initialing a document that conforms with everything that they were told by the salespeople and the management of the resort during the many hours spent in sales-related activity

2.12   However, the verbal explanations given at the point of sale, did not at all, conform with written terms lurking in the Contract to which the Plaintiffs were actually signing that day [Bait & Switch Fraud].

As a result of unlawful UPL conduct overlaid with Fraud, there was: *no meeting of the minds*; and there was: *no meaningful disclosure of the contract terms* [see 2.4 (a) & (b)]. As a result, there are appropriate grounds for Contract Rescission where the violations of Unauthorized Practice of Law (which could also constitute Crimes as well Torts) serve well in evidencing the Fraud against the Plaintiffs.

2.14   The other Form of UPL that is rampant at Holiday Inn et. al is for Wills & Estates Law interpretation, used to deceive all of the Plaintiffs herein, by forming Successor Liability (Generational Liability) as surreptitious and unconscionable term the Contract.

2.15   Consumers are told at the sales level that as the Owner they "can" put the timeshare in their Will. Owners are told they "could" do whatever they want with the timeshare with regard to their Estate, like leave it to one or more of their children as they see fit.

2.16   The resort representatives talk about a high degree of choice and an optional nature to giving the timeshare to Heirs of the Owners.

2.17   The entire Will conversation surrounds the timeshare's characterization as an "Asset" which is claimed by the sales reps to be an ever-appreciating asset creating a "Legacy" for future generations.

2.18   However, due to the *"successors"* clause in the Contract, it is known by sales Reps at the time they are discussing thee optional Will procedures, that in fact the Consumers (the Plaintiffs herein) are being committed to the only Contract document that is being signed in the room that day, and that is a Contract for the purchase of a timeshare from the Defendant, which already inherently forms Joint & Several liability to all those same family members who are in the *Lines of Succession* to the owners.

2.19   Successor Liability was a term in the parties' Contracts for each of the Plaintiffs herein, yet none (zero) of the Plaintiffs had any disclosure of this massive, generational debt obligation (children of Plaintiffs were discussed, but only with regard to Wills).

2.20   The actual word "successors" was buried in a boilerplate sentence with heirs and assigns and other potential future parties, however, the Plaintiffs were unwittingly signing an instrument that transfers escalating debt to future generations upon the last contracted owner's demise, of which none (0%) of the Plaintiffs had any idea whatsoever they were obligating

- 63 -

their future generations, and in all cases (100%), this would have prevented the contract signing.

2.21   Once the sales crew has opened the door to the discussion of the final disposition of the timeshare interest upon death, they cannot solely rely upon a document which has either not been created or must be modified (a Will), when in the room that day the consumers shall sign a document that contains absolute terms of Successor Liability for those very same family members that the Holiday Inn, Silverleaf and Orange Lake sales Reps had discussed would be a completely flexible and optional benefit fully within the control of the owners to decide to whom and when they will pass the timeshare on.

2.22   As a consequence, all of the Plaintiffs have been victimized by Unauthorized Practice of Law on two levels, one form of the UPL rendered the "contract" a nullity (to reform)due to substantial evidence of Fraud & Deceit, and the second form of UPL obligated their family for generations to come, and they had absolutely no idea they were obligating their family, which provides additional grounds for Rescission due to procedural [the contracting process] and substantive *Unconscionability* [the substantive contracting result of harsh, one sided terms].

2.23   Each and every individual Plaintiffs has made statements to Consumer Protection Attorneys and/or Attorney General Offices nationwide.

2.24   Such requests were not acted upon by administrative regulatory agencies, where such statements made it clear that that they would never had signed the contract, had they known about the Successor Liability to their family contained within the Contract.

2.25   Accordingly, BUT FOR the UPL conduct, no contracts would have ever existed in each of the Plaintiff matters before this Court.

2.26   A Judgement should provide a clear message that the Court does not endorse this Fraud by awarding relief of Rescission and/or Punitive Damages, and in fact rule that these precise forms of Fraud are not to be used against Consumers.

- 64 -

2.27 Thus, the Fraud shall be exposed in a true light, where it clearly must be remedied.

## SECTION III
## - FRAUD IN THE OFFER OF SECURITIES -
Violations of Section 17(a) The Securities Act

3.1 Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary Sections "A." "B." "C." "D." and "E." as well as paragraphs 1.1 through 2.27 of this Complaint.

3.2 Defendants, and each of them, by engaging in the conduct described above:

a. directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails: with scienter, employed devices, schemes, or artifices to defraud;

b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

3.4 By engaging in the conduct described above, each of Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECTION IV
## Fraud in Connection with the Purchase or Sale of Securities
Violations of Section 10(b) of The Exchange Act and Rule 10b-5 Thereunder

4.1 Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary Sections "A." "B." "C." and "D." and "E.", and paragraphs 1.1 through 3.4 of this Complaint.

4.2    Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a.    employed devices, schemes, or artifices to defraud;

b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

4.3    By engaging in the conduct described above, each of Defendants violated, and unless restrained and enjoined will continue to violate each of, Section 1o(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

§ 240.1 0b-5.

## SECTION V
## - BREACH OF CONTRACT -
General Performance and Contract Misrepresentation

5.1    Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary Sections "A." "B." "C." "D." and "E.", as well as paragraphs 1.1 through 4.3 of this Complaint.

5.2    To the extent that there is not full tort and/or statutory relief granted to certain Plaintiffs of this multi-party action, such Plaintiffs are entitled to an Award of breach of

- 66 -

contract damages from Defendant, particularly in light of the failure of "consideration" tendered by Defendant.

5.3    Such relief is warranted because here, a Breach of Contract exists due to Contract Misrepresentation under Facts in other causes of action herein to support Fraud, and pled with particularity under (See Section D - PLANTIFF FACTS).

5.4    Plaintiffs should also be entitled to an award of attorney fees, costs, and prejudgment interest under this cause of action or applicable private Attorney General action.

## SECTION VI
## CALIFORNIA TIME-SHARE ACT (2004)
Punitive Damages Against All Defendants

6.1    Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary Sections "A." "B." "C." "D." and "E.", as well as paragraphs 1.1 through 5.4 of this Complaint.

6.2    Choice of Law principles permit the Federal courts to apply the substantive laws of states other than a state of general jurisdiction, as well as apply federal law, to provide remedies to Consumers in consumer fraud situations.  The California Vacation Ownership and Time Share Act of 2004 applies in the case at bar, because Defendant owns numerous timeshare properties in California that are offered as a "accommodation" and sells access to hundreds more in California as part of a "component" or an exchange resort under the marketing system of the Corporate Defendant and in the written contracts between the Defendant and Plaintiffs.

6.3    Under California Business and Professions Code Section 11211.5(a), The California Vacation Ownership and Time Share Act of 2004 applies to:

(a) Time-share Plans with an accommodation or component site in this state [CA].

6.4    Furthermore, California Business and Professions Code, Section 11285, provides:

- 67 -

An action for damages... may be brought by any timeshare interest owner.... Relief under this section does not exclude other remedies provided by law.

6.5    Statutory remedies are available to Plaintiffs under the California Vacation and Ownership Time-Share Act of 2004 which permits remedies for: Contract Rescission and for Damages, including Punitive Damages under California law.

6.6   Plaintiffs herein are entitled to relief under this Act due to among other reasons, ownership of multiple timeshare resorts by Defendants by Holiday Inn, Silverleaf and Orange Lake, all located within California, and also a plethora of component or exchange sites within California (see paragraph 6.3 above referencing resort "accommodations or component sites").

6.7   The California Business & Professions Code's California Vacation and Time Share Act finds applicability for the above listed causes of action and applicability of statutory law in this case. California Business and Professions Code, Section 11285, provides relief to an owner where the Defendant has at least one Timeshare property in the State of California.

6.8   Plaintiffs here in have suffered great loss financially and have been harmed and have been distressed emotionally with physical manifestations (including medical injury and/or exacerbation). All such Harm and impetus for Damages are apparent from the Facts and Causes of Action that are raised herein.

6.9    An award of general damages, punitive damages, attorney's fees, costs, and prejudgment interest in favor of Plaintiffs, and against Defendant is appropriate under Vermont law, and Plaintiffs request such relief.

**SECTION VII**
**JUSDICIAL EFFICIENCY**
**Common Law Rescission**

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

9.1. Defendant is subject to common law rescission for Bait & Switch Fraud (Fraudulent Inducement and Fraudulent Concealment), and Defendant is also subject to statutory law, including a timeshare statute from the State of California and the Vermont Consumer Fraud/ Protection Act that applies to timeshare sales within Vermont (and other states) because they include use of timeshare hotel properties within the State of Vermont.

9.2. Plaintiffs are joining together as co-Plaintiffs where consolidation is judicially efficient because they are the same Defendants with the same Plaintiff claims under the same common law principles and same statutory relief, all with highly similar factual patterns where all Plaintiffs have substantially the same substantive claims and experienced 'fraud schemes' in common with the other Plaintiffs herein, all pled with particularity.

### RESCISSION PER STATUTE
**Public Offering Statement - Improper Notice - Applies to All Plaintiffs**

9.3. For purposes of Judicial Efficiency, this matter would be streamlined with a bright-line statutory ruling regarding disclosure of the Public Offering Statement (POS) that could apply all the Plaintiffs in this action, wherein they would be entitled to, among other things, the right to receive a Public Offering Statement before Plaintiffs signed a timeshare contract.

9.4. Because all the contracts are subject to rescission, all choice of law and liability limitation provisions are void.

9.5. As for "making money" from selling or rental income as promised by Defendant's sales staff, management and contract closers, the Plaintiffs could hardly book rooms for

- 69 -

themselves (let alone rent them out, which has extra restrictions, fees, and costs that were not disclosed, and a suspicious public that has to rent an exact week/location from an unknown person on *Craigslist* et. al).

9.6. Furthermore, resale claims at the point-of-sale could never produce the promised profits of many thousands of dollars but the reality is Defendant's timeshares have historically, and now currently, do <u>not</u> sell for even $1.00.

The real-world, actual results (versus promises) are extremely harsh and one-sided results that are *Unconscionable* because they shock the conscience of a neutral observer, showing the need for Judicial redress (equitable Rescission) for such outrageous acts, perpetrated in defiance of established law.

## SECTION  VIII
## - PUNITIVE DAMAGES -
Outrageous Consumer Law Violations

8.1   Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary Sections "A." "B." "C." "D." and "E.", as well as paragraphs 1.1 through 7.6 of the Complaint.

8.2   Fraud is by definition an intentional Tort.  In addition to substantial harm per Plaintiff detailed due as herein above and long term fees in short term costs due to Bait & Switch Fraud, there is harm in the hundreds of thousands to potentially millions when calculating future [generational] maintenance fees measured in the aggregate, which has caused harm and distress to the Plaintiffs, emotionally, financially, and physically, all as the legal and proximate result of Defendant's willful misrepresentations (Fraud).

8.3   Because of Defendant's egregious acts, the Plaintiffs should justifiably receive an award of Punitive Damages to punish such abusive and predatory conduct as detailed herein above, and cause a strong deterrent to its reoccurrence in the future.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

8.4    Plaintiffs may avail themselves of causes of action cited herein, where relief includes Punitive Damages, thus each Plaintiff can receive Punitive Damages for well over $100,000, and potentially hundreds of thousands per Plaintiff in this action.

8.5    Punitive damages are awarded not as compensation to the sufferer, but "on account of the bad spirit and wrong intention" of the breachor." Clarendon Mobile Home Sales, Inc. v. Fitzgerald, 135 Vt. 594, 596 381 A.2d 1063, 1065 (1977).

8.6    The purpose of punitive damages is to "punish conduct which is morally culpable . . . [and] to deter a wrongdoer . . . from repetitions of the same or similar actions." Coty v. Ramsey Assocs., Inc., 149 Vt. 451, 467, 546 A.2d 196, 207 (1988) (quoting Davis v. Williams, 402 N.Y.S.2d 92, 94 (N.Y. Civ. Ct. 1977)). Punitive damages are permitted "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." W. Keeton et al., Prosser and Keeton on the Law of Torts § 2, at 9 (5th Ed. 1984).

8.7    Another example of statutory punitive damages is under Florida law: Fla. Stat. §895.03 and as derived from violative conduct under §721.11(4), and to grant punitive damages the Court as necessary could apply this statute, or the statute of any state where a purchase occurred.

8.8    As a result, each Plaintiff herein can collect punitive damages for the Fraud that has been perpetrated against them.

8.9    The statutory standards are often lower than Fraud, however statutory standards have been readily exceeded where Fraud is apparent by the defendants in this case.

COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT RESCISSION; BREACH OF CONTRACT; VERMONT CONSUMER PROTECTION ACT

## SECTION IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**Outrageous Behavior**

9.1 Plaintiffs incorporate by reference, as though fully set forth herein, the preliminary

Sections "A." "B." "C." "D." and "E.", as well as paragraphs 1.1 through 8.9 of the

Complaint.

9.2 In Vermont, a person can be liable for infliction of emotional distress for "outrageous

conduct, done intentionally or with reckless disregard of the probability of causing emotional

distress, resulting in the suffering of extreme emotional distress, actually or proximately caused

by the outrageous conduct." Birkenhead v. Coombs, 143 Vt. 167, 174-75 (Vt. 1983) (citing

Spackman v. Good, 245 Cal.App.2d 518, 530, 54 Cal.Rptr. 78, 84-85 (1966).

9.3 Defendant's behavior toward each of the plaintiffs was variously outrageous and

committed with reckless disregard for Plaintiffs' rights and well-being.

9.4 In addition to the reckless disregard, Defendants intentionally used severe emotional

distress as a means of getting plaintiffs to sign the outrageous agreements.

9.5 Defendants' outrageous behavior, Plaintiffs suffered extreme emotional distress and

health consequences, which caused them unjustified harm and damages in an amount to

be determined by this court.

## REQUEST FOR RELIEF

Plaintiffs request that relief be granted and ordered as follows:

1.  For rescission of their Contracts;

2.  For general damages in an amount according to proof;

3.  For common law relief, statutory relief under Vermont, California and Federal Law;

- 72 -
COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT;VERMONT CONSUMER PROTECTION ACT

1    4. For Intentional Infliction of Emotional Distress as allowed by Vermont law.

2    5. For punitive damages to punish the Defendant and deter such future conduct;

3

4    6. For attorney's fees, court costs, prejudgment interest; and,

5    7. For such other and further relief as this Court may deem just and proper.

6

7

8                              Dated this 17th day of April 2019.
                             **THE ABRAMS LAW FIRM**

9

10                             Joshua Martin, VT Bar No. 4713
                            Attorney for the Plaintiffs' Group

11

12                     **DEMAND FOR JURY TRIAL**
        Pursuant to Federal Rule of Civil Procedure 38 (b), Plaintiff requests a jury trial of all

13 issues triable of right by a jury.

14

15

16

17

18

19

20

21

22

23

24

25

26

27                             - 73 -

28 COMPLAINT FOR DAMAGES FOR FEDERAL SECURITIES CLAIMS; COMMON LAW FRAUD; CONTRACT
RESCISSION; BREACH OF CONTRACT; VERMONT CONSUMER PROTECTION ACT